IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| H.D., | : | CIVIL ACTION |
| *A Minor, by and through his Parents,* | : | |
| *A.S. and A.D.* | : | No. 11-4365 |
| | : | |
| v. | : | |
| | : | |
| CENTRAL BUCKS SCHOOL DISTRICT | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                          **September 28, 2012**

Plaintiff H.D., a learning disabled student, by and through his parents, A.S. and A.D. (Parents), filed the instant action under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq., to challenge the Pennsylvania Special Education Hearing Officer's determinations that (1) the individualized education program offered by Defendant Central Bucks School District (the District) was appropriate, and (2) H.D. was not entitled to a publicly funded independent educational evaluation.  H.D. also asserts a discrimination claim against the District under the Rehabilitation Act, 29 U.S.C. § 794.  The parties have filed cross-motions for judgment on the administrative record.  For the following reasons, this Court will grant the District's motion and enter judgment in favor of the District.

## STANDARD OF REVIEW

The IDEA permits a party dissatisfied with the outcome of a due process hearing to appeal the hearing officer's decision by filing suit in federal district court.  20 U.S.C. § 1415(i). The district court receives the record of the administrative proceeding, hears additional evidence at either party's request, and, using a preponderance of the evidence standard, grants such relief as the court determines is appropriate.  20 U.S.C. § 1415(i)(2)(c).  Under this standard, the court

is required to give "due weight" to the hearing officer's decision.  *Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982).  The "due weight" requirement, which has been described as "modified *de novo*" review, means a federal district court reviewing an administrative fact-finder's conclusions is required to defer to such factual findings unless the court identifies contrary non-testimonial extrinsic evidence in the record or explains that the record read in its entirety compels a different conclusion.  *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003).

**FACTS**

H.D. was first identified as IDEA-eligible based on his Attention Deficit Hyperactivity Disorder (ADHD) in early 2009, when he was enrolled in fourth grade at Groveland Elementary School (Groveland) in the Central Bucks School District.  A District evaluation found H.D. had above-average intelligence and identified his need for academic support as low, although his ADHD did impact his learning.  H.D.'s behavior has always been the primary concern of both Parents and the District, particularly his disrespectful and aggressive verbal and physical conduct.  The evaluation identified H.D.'s need for behavioral, social, and/or emotional support as significant, specifically in the areas of following rules, paying attention, social skills, work habits, independent task completion, acceptance of change and transition, organization, impulsive/off-task behaviors, and dealing appropriately with anger and frustration.

The District first proposed an individualized education program (IEP) for H.D. in April 2009, which Parents accepted.[1]  This IEP set forth measurable annual goals in the areas of self-awareness of behaviors and choosing and utilizing coping strategies for dealing with frustration.

---

[1] An IEP is a written statement that must be developed for each student eligible under the IDEA which includes the student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching the goals.  20 U.S.C. § 1414(d).

The IEP placed H.D. in itinerant learning support at his current school, Groveland.  Itinerant support is defined in the IEP as "[s]pecial education supports and services provided by special education personnel for 20% or less of the school day."  Ex. District 6, at 18.  The IEP also provided that support would be delivered through various forms of specially designed instruction (SDI), including preferential seating; non-verbal prompting to attend to instruction; verbal prompts to remain on task; weekly small group pull-out instruction in anger management, frustration tolerance, and social skills; and small group or one-on-one academic instruction in the classroom when needed.  The IEP also set forth a behavior intervention plan (behavior plan), which served as a guide to H.D.'s teachers for preventing negative behavior, dealing with negative behavior through replacement strategies, and responding to H.D. when he behaved appropriately or performed behaviors of concern.

In June 2009, the IEP team met to revise H.D.'s IEP.[2]  While H.D. was meeting some of his goals at that time, he was not showing improvement in the number of disrespectful and physically aggressive behaviors exhibited.  The District proposed a new IEP that revised the SDI, goals, and behavior plan, and changed H.D.'s placement from itinerant learning support services at Groveland to full-time emotional support services at Linden Elementary (Linden), a school in the District with an emotional support program for grades 3 through 6, which Groveland does not have.  Parents opposed the change in placement and filed an administrative due process complaint, which Parents and the District resolved in favor of keeping H.D. in itinerant learning support at Groveland for the next school year.

---

[2] Under the IDEA, the IEP team must consist of the student's teachers and parents, a school district curriculum specialist, and, if requested, an individual with knowledge or expertise regarding the student.  20 U.S.C. § 1414(d)(1)(B).  H.D.'s IEP team typically consisted of Parents, H.D.'s regular education teacher, his special education teachers, a special education supervisor, Groveland's principal, the school psychologist, a behavioral specialist, and one or more other administrators or staff.

H.D.'s IEP was revised again in August 2009, placing H.D. in itinerant learning support at Groveland, as agreed upon by Parents and the District.  The revised IEP included all of the same goals and SDI from the April 2009 version.  It also added new goals to address H.D.'s negative verbal and physical conduct toward peers and adults, and additional SDI, including extra writing support; checklists to aid organization; and two 30-minute sessions per week of small group or one-on-one instruction in the learning support classroom in goal setting, goal redirection and feedback, support with organization, and the writing process.  The August 2009 IEP also prescribed brief, daily counseling sessions each morning with the school psychologist to specifically address H.D.'s negative behaviors.  The behavior plan was left virtually unchanged from the April 2009 IEP.

In October 2009, the IEP team met again, in part to address Parents' recent partial hospitalization of H.D. due to extreme behavioral problems at home.[3]  The IEP team proposed a revised IEP which maintained the August 2009 IEP's goals, behavior plan, and SDI, and added several new SDI to be implemented in the regular education classroom to assist H.D.'s organization, writing, assignment completion, and test taking.  The District and Parents also agreed to a reevaluation of H.D.'s support needs in the form of a Functional Behavioral Assessment (FBA) by a board certified associate behavior analyst (BCABA) under contract with the Intermediate Unit for Bucks County.  Parents agreed to the revised IEP, provided that the program also included daily, 30-minute meetings with the special education teacher and that the IEP team meet again by mid-December to review H.D.'s progress and the progress of any new behavior plan incorporating the findings of the FBA.

_____

[3] H.D. argues the Hearing Officer ruled H.D.'s partial hospitalization in 2009 was not relevant to the determination of whether the proposed March 2010 IEP (the challenged IEP here) was appropriate and therefore may not be considered.  Although this Court cannot determine if, in fact, the Hearing Officer so ruled, this hospitalization is relevant insofar as it informed the IEP team in creating any portion of the challenged IEP.

To complete the FBA, the BCABA reviewed H.D.'s educational records, prior IEPs, behavioral assessments, and behavioral plans.  The BCABA also interviewed Parents and H.D.'s educational team and observed H.D. in his various school settings over a three-day period.  The FBA identified four targeted behaviors for which the BCABA collected data:  (1) on-task behavior; (2) noncompletion of requested tasks; (3) inappropriate verbal behavior; and (4) inappropriate physical contact.  It also identified a number of immediate triggers of these targeted behaviors and a number of consequences of the behaviors that reinforce, punish, or have no effect on each behavior.  The FBA further identified H.D. as having skill deficits in self-awareness, self-control, communicating wants and needs appropriately, social skills (i.e., initiating and reciprocating appropriate social interactions), performance accuracy, and remaining on task.  It proposed that these deficits be addressed by adopting a behavior plan directed at increasing H.D.'s ability to appropriately interact with adults and peers, monitor his own behavior, remain on task, and complete work accurately.

Meanwhile, in November 2009, the IEP was revised only to reduce the number of assignments H.D. had to complete each day to one, with that number to increase as H.D. became capable of handling more assignments.

The IEP team met again in December 2009 to incorporate the findings in the FBA into a new IEP.  This IEP revised H.D.'s goals to address noncompletion of requested tasks, inappropriate verbal behavior, and inappropriate physical contact.  The SDI from the previous IEP were maintained except for the use of a study and assignment log and the twice weekly 30-minute small group or one-on-one instruction in the learning support classroom on goal setting, organization, and writing, both of which were removed.  The 30-minute daily one-one-one session with the special education teacher on organization, completion of tasks, and studying,

which had been specifically requested by Parents, remained.  The behavior plan was also revised

to incorporate the findings in the FBA.  The new behavior plan identified the four target

behaviors central to the FBA and provided strategies to prevent trigger events, strategies to help

H.D. develop replacement behaviors, and instructions on how H.D.'s teachers should respond

when he performed replacement behaviors or exhibited negative behaviors, all with great detail.

A key strategy for dealing with negative behaviors was redirecting H.D.'s attention and allowing

him to de-escalate.  A "crisis plan" was also proposed for when H.D. "place[d] him[self] or

others at risk ([e.g.], aggression, throwing objects, etc.) or create[d] a significant disruption to the

classroom ([e.g.], not able to regain control of his behavior)."  Ex. District 17, at 30.  The crisis

plan called for further de-escalation outside of the classroom, and, if H.D. still posed a threat to

himself or others, or was still disrupting the educational process, teachers and staff were directed

to contact the administrative offices, including the principal, for further support.   Parents

approved the December 2009 IEP, and the District implemented the plan in early January 2010.

On January 12, 2010, in response to H.D.'s intense reluctance to being pulled from his

regular education classroom for support services, Parents and the District agreed to a two-week

trial period during which H.D.'s daily meetings with the school psychologist were reduced to

three days per week and his daily meetings with the special education teacher were reduced to

one day per week.

On February 3, 2010, the IEP team met again and produced a revised IEP.  This version

included updated present levels of H.D.'s academic achievements and functional performance.

Generally, H.D. had shown substantial academic progress, meeting grade level expectations.  He

was also meeting a number of his behavioral goals; however, some of his target behaviors,

particularly verbal and physical aggression, remained significant, as evidenced by a two-day out-

of-school suspension for physical aggression toward a student in the end of January 2010.  The February 2010 IEP maintained the goals from the prior IEP and added specific percent reductions of the targeted behaviors based on data collected since the new FBA-inspired behavioral plan was implemented.  The SDI remained from the previous IEP, and after the trial period of reduced sessions with the special education teacher and school psychologist, these two interventions were revised so that H.D. would spend a "minimum" of 30 minutes per week receiving one-on-one support in the learning support classroom with the special education teacher for studying, homework, and review of materials, and would visit the psychologist three mornings per week for individual behavioral counseling.  The behavior plan remained the same, except for the addition to the crisis plan that "the administration will assume responsibility for the dissemination and enforcement of discipline using the districtwide code of rights, responsibilities, and student discipline."  Ex. District 19, at 32.[4]  Although H.D. asserts Parents were not in favor of reducing the pull-out learning support and psychological counseling sessions, Parents accepted the IEP.

On March 18, 2010, the District proposed the IEP which H.D. now asserts is insufficient under the IDEA and forms the basis of his claim.  While H.D.'s learning support services had succeeded in allowing him to progress academically, they had not led to similar sustained improvement of his social and emotional behavior problems.   H.D.'s negative behaviors, particularly abusive verbal conduct and aggressive physical contact, had increased significantly

---

[4]  H.D. asserts this change "removed the non-confrontational de-escalation responses written into the first behavior plan, and inserted discipline by the principal."  Pl.'s Br. in Supp. of Mot. for J. on the Admin. R. 8.  The February 2010 IEP and testimony by Principal David Heineman, however, show de-escalation remained a first-level intervention both when H.D. was behaving inappropriately and when the crisis plan was implemented.  Moreover, Heineman testified when he was called upon during a crisis to intervene and remove H.D. from the room, he continued to use de-escalation strategies in his office.

in the early part of 2010, raising safety concerns for both H.D. and his classmates.[5] The staff's ability to interrupt and redirect H.D.'s negative behaviors had decreased, and the behavioral interventions that had once been successful were no longer working. As a result, H.D. was severely alienating himself from his classmates with his behavior, which, in turn, was impeding crucial development of his social skills.

Consequently, the March 2010 IEP contained revisions focused on addressing both H.D.'s academic progress and lack of behavioral progress. It updated H.D.'s present levels of academic and behavioral progress with data collected over the prior months, and revised the goals, SDI, and behavioral plan to address H.D.'s current needs. The goals from the prior IEP remained, but the target for inappropriate physical conduct was reduced from one to zero incidents per day. Three more behavioral goals were added for initiating positive peer interactions, respecting personal space and boundaries, and using a "break card" when frustrated. Most of the SDI from the previous IEP remained, with the 30-minute per week individual support sessions now focusing on behavioral expectations rather than academics. Verbal on-task prompting, non-verbal cues, and testing accommodations were removed. Several other SDI were added, with some directed at H.D.'s needs generally, such as seating next to the source of instruction, "chunking" by skill for math, checkpoints for long-term assignments, and verbal information paired with visual representation, and others focused on promoting positive behavior and building social skills, including the 30-minute one-on-one behavior instruction with the

---

[5] H.D. argues the Hearing Officer relied heavily on inadmissible hearsay evidence, and during the administrative hearing, H.D.'s counsel objected frequently to testimony regarding incidents of H.D.'s negative behavior as hearsay. In most instances when a witness was testifying about an incident the witness had been told about but had not seen, the Hearing Officer correctly admitted the testimony because it was being offered to show the basis for an opinion or a decision—usually the revision of an IEP—not for the truth of the matter asserted. Nevertheless, there was ample first-hand evidence regarding H.D.'s increased negative behaviors in the second half of the 2009-2010 school year.

special education teacher, weekly 45-minute direct instruction on social skills, and application of social skills through a "lunch bunch group." Ex. District 21, at 24-25. The bulk of the prior behavior plan was retained, with some additions and exceptions. The new behavior plan added new replacement strategies, contingencies for inappropriate verbal and physical conduct, and a crisis plan for leaving school without permission. The most significant change in the behavioral plan, however, was the elimination of off-task behavior as one of the targeted behaviors. The plan also eliminated several of the instructions for avoiding behavior triggers, although some were merely combined or listed as SDI.[6]

The most significant change proposed in the March 2010 IEP, however, was the change of H.D.'s placement from itinerant learning support services at Groveland to itinerant emotional support services at Linden, to begin at the start of the following school year. Again, this change was in direct response to H.D.'s insufficient progress with respect to his negative behaviors, particularly inappropriate physical contact and inappropriate verbal conduct, under the prior IEPs which had incorporated the FBA. The District believed emotional support services were necessary for improving H.D.'s social skills and aggressive and inappropriate behavior, which were creating a severe impediment to his overall education and development. H.D. was not responding to the limited social skills instruction the District was able to provide at Groveland through daily meetings with the school psychologist, and, in fact, pulling H.D. from his regular education classroom had begun to trigger some of his targeted behaviors. The IEP placed H.D.

---

[6] The eliminated provisions for avoiding behavior triggers included pre-teaching strategies for difficult concepts, providing choices in the sequence of activities, access to pre-approved manipulatable objects, directions for group instruction, posting rules, prompting, and providing initial direction only once. The eliminated instructions represent only a small fraction of such provisions in the previous behavior plan, and the behavior plan overall in the March 2010 IEP remained comprehensive. The record therefore belies H.D.'s assertion the March 2010 IEP greatly reduced the behavior plan and removed most of the controls for avoiding behavior triggers.

at Linden because it was near H.D.'s home and offered emotional support services which Groveland did not.  Linden's emotional support program is focused on changing behaviors and is staffed by teachers specially trained in helping students control their behaviors, with particular emphasis on teaching students de-escalation skills to prevent behavioral crisis situations.  The emotional support staff is also experienced in collecting and analyzing data and creating behavioral intervention plans for students with emotional support needs.  Furthermore, the faculty and staff at Groveland who regularly observed H.D. believed he had severely alienated himself from his classmates through his inappropriate behavior.  Given the development of appropriate social interaction skills was key for H.D.'s educational success, the District felt H.D. would benefit from a new peer group, especially one accustomed to students with H.D.'s needs, which he would have at Linden.

After the IEP team met to discuss this new proposed IEP, Parents did not formally accept or reject the IEP, but requested an additional meeting to discuss the change of placement and any other elements with which they did not agree.  Parents also requested the District supply a second independent FBA at the public's expense.  On April 21, 2010, the District denied Parents' request for an independent FBA, and filed a due process complaint as required under the IDEA. *See* 34 C.F.R. § 300.502(b)(2)(i).

On May 27, 2010, the District invited Parents to another IEP meeting scheduled for June 3, 2010.  On June 2, Parents informed the District they could not attend the June 3 meeting because their attorney could not be present.  The IEP meeting was rescheduled to June 8.  On June 7, however, Parents filed a due process complaint challenging the March 2010 IEP.  The IEP meeting went forward on June 8, and a new proposed IEP was presented on June 9, 2010.

The June 2010 IEP was largely unchanged from the March 2010 IEP, with the exception of updated present levels of performance and a few additions to the behavioral plan. These changes were based on data collected and observations made since the proposal of the March 2010 IEP, parts of which the District had implemented at Groveland. As noted in the June 2010 IEP, H.D.'s maladaptive behaviors continued to increase in the latter part of the school year. Parents rejected this proposed IEP as well.

The District's and Parents' due process complaints were consolidated for a hearing before a Special Education Hearing Officer. After four days of testimony, the Hearing Officer issued an interim order on August 27, 2010, ordering that H.D. would start the school year at Linden, but reserved ruling on the parties' due process claims.

Parents were permitted to have their expert school neuropsychologist, Dr. James B. Gillock, observe H.D. at Linden and provide a report and testimony on the adequacy of the IEP and the appropriateness of H.D.'s placement at Linden. Dr. Gillock recommended H.D.'s IEP include more learning support in addition to emotional support services, but testified H.D. appeared to be adjusting well to Linden, was reporting greater happiness, and had more positive peer relationships. Plans to take additional evidence regarding H.D.'s placement were thwarted when Parents hospitalized H.D. in mid-December 2010 because of an emotional crisis.[7]

On April 29, 2011, the Hearing Officer issued a final decision, ruling in favor of the District on Parents' claim that the proposed IEP was inappropriate under the IDEA, and in favor of the District on its claim that Parents were not entitled to an independent FBA at the public's

---

[7] The only record of this fact was a statement by H.D.'s counsel during the due process hearing. Nevertheless, the fact was included in the Hearing Officer's final findings of fact. Neither party has commented on whether this specific fact is appropriately part of the record; however, H.D. argues the fact of an earlier hospitalization was ruled irrelevant by the Hearing Officer. In any event, the fact of the mid-December hospitalization does not sway this Court's ultimate decisions either way, and because it was included in the Hearing Officer's final decision, it is included here.

expense.  The Hearing Officer also denied and dismissed any additional claims not expressly addressed in the final decision.  H.D. filed the instant action appealing the Hearing Officer's decision on July 7, 2011.

**DISCUSSION**

The IDEA requires schools receiving federal funds to provide disabled students a free, appropriate public education (FAPE).  20 U.S.C. § 1412(a)(1).  "A free, appropriate public education consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  *State-Operated Sch. Dist.*, 336 F.3d at 264 (citations omitted).

Schools provide an eligible child with a FAPE through an IEP.  *Id.*  "An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services."  *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010) (citation omitted).  "[A]t a minimum, the IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  *Id.* (quoting *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009)).  But the IEP need only provide a "basic floor of opportunity," not "'the optimal level of services' that parents might desire for their child."  *Id.* (quoting *Holmes v. Millcreek Twp. Sch. Dist.*, 205 F.3d 583, 590 (3d Cir. 2000)); *see also T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (holding an "IEP must provide significant learning and confer meaningful benefit" to be satisfactory (citation omitted)).  Additionally, the IEP must be created by a team consisting of the student's teachers and parents, a school district curriculum specialist,

and, if requested, an individual with knowledge or expertise regarding the student.  20 U.S.C. § 1414(d)(1)(B).

The IDEA also requires that schools provide a FAPE in "the least restrictive environment" (LRE).  20 U.S.C. § 1412(a)(5)(A); *see also Kingwood Twp. Bd. of Educ.*, 205 F.3d at 578 (holding together, FAPE and LRE require "a child be placed in the least restrictive environment . . . that will provide him with a meaningful educational benefit").  "The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled."  *State-Operated Sch. Dist.*, 336 F.3d at 265 (citation omitted).  "[T]he LRE would ideally be the same school the child would have attended if she were not disabled"; however, "such placement is only appropriate to the extent that it 'satisfactorily educates' the disabled child."  *Id.* at 272 (citation omitted); *see also* 34 C.F.R. § 300.116(c) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled.").

H.D. asserts the March 2010 IEP, when it was written, did not offer him a FAPE in the least restrictive environment.  Whether an IEP is appropriate is a question of fact, and thus the Hearing Officer's determination of this issue is given due weight.  *Bayonne Bd. of Educ.*, 602 F.3d at 564.  Under such review, H.D. has not met his burden of showing the March 2010 IEP failed to offer him meaningful educational benefits in the least restrictive environment.  *See L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 392 (3d Cir. 2006) (holding the party challenging the appropriateness of an IEP bears the burden of proof).

As an initial matter, the parties dispute the appropriate scope of H.D.'s claim and the evidence which may be considered in determining whether the challenged IEP was satisfactory.

13

H.D. asserts because his due process complaint pertained to the IEP created on March 18, 2010, this Court may not consider the June 2010 IEP or any events occurring after March 18.  The Hearing Officer rejected these arguments, noting the events leading up to and including the proposal of the June IEP were known to H.D. at the start of the due process hearing, the June IEP was nearly identical to the March IEP, and the June IEP aims to provide H.D. with meaningful educational benefits, which is the central issue of H.D.'s claim.  While "a court should determine the appropriateness of an IEP as of the time it was made," it may consider evidence acquired after the creation of an IEP, but "only to evaluate the reasonableness of the school district's decisions at the time that they were made."  *Bayonne Bd. of Educ.*, 602 F.3d at 564-65 (citing *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995)).  Therefore, it was appropriate for the Hearing Officer, as it is for this Court, to consider evidence acquired after March 18, 2010, so long as it is used to evaluate the appropriateness of the March 2010 IEP when it was written.  As to the June 2010 IEP, it is unnecessary to analyze whether it offered a FAPE in the LRE because this Court agrees with the Hearing Officer that the March 2010 IEP, which is substantively identical to the June IEP, is appropriate under the IDEA.

Turning to the substance of H.D.'s claim, the record amply confirms the Hearing Officer's finding that the March 2010 IEP offered H.D. a FAPE.  The District made extraordinary efforts to shape an education program to allow H.D. to progress in both his academic and behavioral performance.  Revisions to his IEP were made to reflect the observations and data showing which interventions were and were not succeeding, with unsuccessful interventions and supports removed and successful ones retained.  An FBA by a board certified associate behavioral analyst was conducted and incorporated into the IEPs.  Although these revisions led to academic progress, the various behavioral interventions

reasonably available at Groveland were not producing lasting improvement in H.D.'s serious behavior problems or assisting H.D. in developing appropriate social skills.  The March IEP's SDI, behavior plan, and placement of H.D. in itinerant emotional support provided a reasonable next step in maintaining H.D.'s academic progress while attempting to provide H.D. the meaningful educational benefits he could not receive through learning support services only.

H.D. argues, however, the decision in February 2010 to reduce one-on-one learning support and meetings with the school psychologist caused the increase in negative behaviors the District relied on in placing H.D. in emotional support.  H.D. also argues the District's data show behavioral improvements leading up to the March 2010 IEP, contrary to the District's assertions.  But school staff and administrators testified at the administrative hearing that H.D.'s negative behaviors began to increase before these changes occurred, and that pulling H.D. out of class to see the psychologist and his special education teachers would often precipitate negative behaviors.  Moreover, the Hearing Officer found the testimony about H.D.'s behavioral decline to be credible, and the data cited by H.D. does not persuade this Court to undermine that determination.

H.D. also argues the changes in the March 2010 IEP's behavioral plan both removed interventions necessary to address his educational needs and caused increases in inappropriate behavior.  This Court agrees with the Hearing Officer that these changes were, in fact, not significant, and the overall IEP offered a multitude of interventions to address H.D.'s ADHD and other academic needs, as well as his more serious behavioral issues.  The record also does not support H.D.'s argument because the increase in his negative behavior began before the implementation of the March IEP's behavior plan.  The only evidence suggesting the provisions eliminated from that behavior plan are necessary to provide H.D. with a FAPE is testimony from

H.D.'s expert witnesses, which testimony the Hearing Officer must have found less credible than the conflicting testimony of the District's witnesses.

H.D. therefore has not established the March 2010 IEP was not reasonably calculated to enable him to receive meaningful educational benefits in light of his intellectual potential. *Bayonne Bd. of Educ.*, 602 F.3d at 557. This Court agrees with the Hearing Officer's finding that the IEP offered H.D. a FAPE.

This Court also agrees with the Hearing Officer's finding the March 2010 IEP offers a FAPE in the least restrictive environment. The LRE requirement ensures that, to the greatest extent possible, disabled children are educated with nondisabled children in the regular education environment. 20 U.S.C. § 1412(a)(5)(A); *Kingwood Twp. Bd. of Educ.*, 205 F.3d at 578 (referring to LRE as the IDEA's "mainstreaming component"). H.D. does not contend the March 2010 IEP fails to educate him with other nondisabled children, and indeed, the IEP proposes that H.D. receive services within his general education classroom over 97% of each day. Ex. District 21, at 32. Rather, H.D. argues his placement at Linden violates the LRE requirement because his educational needs can be met at his neighborhood school, Groveland. While it is true the LRE requirement also indicates a preference for placement in the school the student would attend if not disabled, this preference is limited by the student's educational needs. *See* 34 C.F.R. § 300.116(c) ("Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."); *State-Operated Sch. Dist.*, 336 F.3d at 272 (recognizing a preference for placement in student's neighborhood school only to the extent such placement provides satisfactory education).

Here, placement in emotional support at Linden was necessary to meet H.D.'s educational needs. The support services available at Groveland were not providing H.D. with

meaningful educational benefits.  The March IEP sought to remedy this by providing H.D. with support by teachers and staff at Linden with specific training to assist him in improving his social skills and reducing inappropriate behaviors, as well as by providing H.D. with a new peer group necessary for his social development.  The emotional support services at Linden offered the educational benefits H.D. most required while also meeting his learning support needs, something Groveland simply could not offer.

While Dr. Gillock's testimony seems to suggest H.D. was improving at Linden in the fall of 2010, such evidence is not needed to demonstrate the appropriateness of the March 2010 IEP.  Also, such evidence has limited analytical value because it may be considered only in evaluating the reasonableness of the March 2010 IEP at the time it was written.  *See Bayonne Bd. of Educ.*, 602 F.3d at 564-65.  H.D. seems to suggest his condition worsened farther into his time at Linden, after the administrative record had closed, and sought leave to supplement the record, which this Court denied.[8]  Nevertheless, because the issue is whether the March IEP was appropriate when written, this Court will not engage in a hindsight examination based on incomplete evidence acquired nine months after the IEP was created.  Such evidence is more appropriate for a claim alleging deprivation of educational benefits, which H.D. did not assert in

---

[8] H.D. requested leave to take additional testimony from Dr. Gillock with which to supplement the administrative record.  H.D. argued the additional testimony was necessary because the Hearing Officer prevented Dr. Gillock from opining on the appropriateness of H.D.'s placement and proposed education supports.  This Court disagreed and viewed the request as an attempt to take a second bite at the apple.  Furthermore, insofar as H.D. sought to have Dr. Gillock testify as to the impact placement at Linden had on H.D. after the administrative record had closed in December 2011, any such evidence would be too attenuated to assist this Court in deciding whether the IEP was appropriate when it was written nine months earlier.  *See Bayonne Bd. of Educ.*, 602 F.3d at 564-65 (holding after-acquired evidence may only be considered in determining appropriateness of IEP when it was written).  Accordingly, this Court denied the request by Order of January 4, 2012.  *See Susan N.*, 70 F.3d at 760 (3d Cir. 1995) (holding courts have broad discretion to decide whether it is appropriate to admit additional evidence into the administrative record).

his due process complaint.  This Court thus finds the March 2010 IEP offered H.D. meaningful educational benefits in the least restrictive environment.

In his Complaint in this action, H.D. also asserted the IEP was inappropriate because the District did not involve Parents in its creation, as required under the IDEA.  *See* 20 U.S.C. § 1415(b)(1) (providing parents must be given an opportunity to examine all records relating to the child and participate in meetings with respect to placement and FAPE).  This matter was not briefed by either party, although it was argued before the Hearing Officer and decided in favor of the District.  This Court finds no evidence in the record to disturb the Hearing Officer's ruling, as the District never denied Parents the opportunity to participate in the IEP revisions.  *See id.* § 1415(f)(3)(E)(ii) (providing the hearing officer may find absence of FAPE for lack of parent participation only if the school "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]").  Rather, Parents were involved in every IEP revision, serving as meaningful collaborators, even if their ultimate request that H.D. stay at Groveland was not incorporated into the March 2010 IEP.  *See, e.g.*, *J.C. ex rel. C v. New Fairfield Bd. of Educ.*, No. 08-1591, 2011 WL 1322563, at *16 (D. Conn. Mar. 31, 2011) (noting IDEA provides parents a right to attend IEP meeting and participate as equal collaborators, but not a right to dictate terms of the IEP).  Accordingly, judgment will be granted in favor of the District on H.D.'s claim that the IEP was not appropriate under the IDEA.[9]

_____

[9] In his Complaint in this action, H.D. asserts a claim for compensatory education, arguing the delay in resolving his due process complaint resulted in a denial of a FAPE.  Compensatory education may be awarded if a school deprives a student of a FAPE.  *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 739 (3d Cir. 2009).  But H.D.'s due process complaint did not assert the District denied him a FAPE, only that his IEP did not offer a FAPE, a claim for which compensatory education is not available.  *Id.* ("The right to compensatory education arises not from the denial of an appropriate IEP, but from the denial of appropriate education.").  This Court will therefore not entertain this new claim on appeal, and will deny the request for

With respect to H.D.'s request for an independent FBA at the public's expense, this Court agrees with the Hearing Officer's determination that H.D. is not entitled to such an evaluation. Under the IDEA, if a student receives an evaluation with which the parent disagrees, the parent has a right to an independent evaluation at the public's expense unless the public evaluation is shown to be appropriate.  34 C.F.R. § 300.502(b).  The IDEA requires that evaluations use a variety of assessment tools and strategies to gather information; not use any single measure in determining an appropriate educational program; use technically sound instruments to assess the relative contribution of cognitive and behavioral factors, as well as physical and developmental factors; are conducted by trained and knowledgeable personnel; assess the child in all areas of suspected disability; and provide assessment tools and strategies that provide relevant information to assist persons in determining the child's educational needs.  20 U.S.C. § 1414(b).

The FBA provided by the District was conducted by a qualified, board certified associate behavioral analyst, used various methods of collecting relevant data, identified the most significant behaviors of concern, identified the triggers and consequences of those behaviors, and provided instruction on how to create an educational program and behavior plan to address those behaviors and H.D.'s other skill deficits.  Although some of the behavioral interventions based on this FBA succeeded while others did not, there is nothing in the record to suggest the FBA is flawed, and there is nothing in the record to permit this Court to find contrary to the Hearing Officer.  Accordingly, judgment will be granted on this claim in favor of the District.

Next, H.D. asserts a claim of discrimination under section 504 of the Rehabilitation Act, 29 U.S.C. § 794, alleging the District discriminated against him by failing to offer him a FAPE

---

compensatory education. *See Centennial Sch. Dist. v. Phil L. ex rel. Matthew L.*, 799 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 2011) (denying new IDEA claims raised for first time on appeal (citing *Del. Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006))).

and by excluding him from his regular education classroom setting.  Because this claim appears to be based on the same underlying allegations in H.D.'s IDEA claim, it is dismissed because he has failed to establish his IDEA claim.  *See, e.g.*, *Miller ex rel. S.M. v. Bd. of Educ.*, 565 F.3d 1232, 1246 (10th Cir. 2009) (noting that "complying with the IDEA is sufficient to disprove educational discrimination"); *N.L. v. Knox Cnty. Schs.*, 315 F.3d 688, 695-96 (6th Cir. 2003) ("In sum, precedent has firmly established that section 504 claims are dismissed when IDEA claims brought on the theory of a denial of free appropriate public education are also dismissed."); *CG v. Penn. Dep't of Educ.*, No. 06-1523, 2012 WL 3639063, at *32 (M.D. Pa. Aug. 23, 2012) (dismissing section 504 claim based on same allegations underlying an IDEA claim which had failed).  Even if this claim is not premised on the same allegations as the IDEA claim, H.D. has not established the elements of discrimination under section 504; specifically, there is no evidence the District discriminated against him or denied him benefits because of his disability.  *See Chambers*, 587 F.3d at 189 (holding for plaintiff to prevail on a section 504 claim, he must demonstrate he "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of h[is] disability").  Judgment will therefore be granted in favor of the District on this claim.

      An appropriate judgment follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, J.